## HERMAN KUPFER

### *v.*

## THE BANK OF GALENA.

1. MONEY DRAFTS — *acceptor when liable.* An accepted draft is like a promissory note, and the acceptor is regarded in the same light as the maker of such note.

2. PROMISE BY DRAWER. If the drawer of a bill of exchange or draft, with knowledge of the fact of non-acceptance by drawee, promises to pay the draft, such promise is binding and can be enforced.

3. BANKS — *accounts between.* Where accounts are kept between different banks, and one of them fails to pay over money received on drafts or bills of exchange collected for the other, the remedy is against the defaulting bank, and not against the drawer of the bill or draft.

4. DEPOSIT OF GOLD COIN — *how to be accounted for.* Where, before the passage of the "legal tender" laws by Congress, a deposit of gold coin had been made in a bank, and drawn out by checks, paid in Treasury notes, such bank is responsible for the value of the coin, as compared with the notes in which the drafts or checks on this deposit were paid.

APPEAL from the Circuit Court of Jo Daviess county; Hon. B. R. SHELDON, Judge, presiding.

It appears from the record that in 1860 the appellant was a wheat buyer at Galena, and one R. G. Parks was operating a flouring mill at La Salle. The purchase of wheat by appellant appears to have been made for the benefit of Parks. A bank was established at Peru, called the Bank of Peru, of which N. R. Haskell was the cashier and manager, and one at Galena, called the Bank of Galena, of which N. Corwith was the president and manager.

On the sixth of June, 1860, appellant addressed this letter to Parks: "Dear sir — I understood yesterday you made arrangements with the bank of Galena to cash my drafts. After presenting your letter to N. Corwith & Co., I found out that they are going to take the drafts only under my own responsibility. As it is against my principles to sell grain on time, I would like you to make such arrangements here as to get the cash for the wheat on delivery." On the 7th of June, Parks went to Galena for the purpose of securing wheat for shipping to La Salle, and on that day met appellant, and also Cook and Pendleton, grain dealers, and went with Cook to the Bank of Galena, who introduced him to one of the Mr. Corwiths, for the purpose of making the necessary arrangements for the payment of wheat he might purchase.

The Bank of Peru had given to Parks the following letter of authority, which was shown to Corwith in the Bank of Galena, and left with him or with some of the parties shipping wheat: "Bank of Peru, Peru, Ill. June 7, 1860. R. G. Parks

is hereby authorized by himself or his agent, to draw on this bank, at not exceeding one dollar per bushel for wheat at Dunleith, Galena or Warren, accompanied by Illinois Central Railroad receipts for the same, at such time as he shall arrange. Said drafts to be sent direct to this bank for collection. N. R. Haskell."

Under this letter of credit, Cook, Pendleton and Co., and appellant, shipped grain to the Bank of Peru for Parks. Appellant shipped wheat consigned to the Bank of Peru, and drew drafts on the bank, for the cost of the wheat, payable to the order of Corwith and Co. on Bank of Galena. Drafts were attached to the railroad receipts for all such shipments. The first shipment was made on the 28th of June, 1860, and shipments continued to be made until the 17th November of that year. Parks received from the Bank of Peru, a number of drafts with such railroad receipts attached. The wheat shipped was of the value of the drafts drawn in favor of the appellee against it.

When the wheat arrived at La Salle, Parks received it, and paid the drafts to the Bank of Peru. He paid forty-six of such drafts, two of them being the same as those claimed in the third and fourth counts of the declaration, namely: one for $1,039\frac{54}{100}$ dated November 6, 1860, at fifteen days after sight, the other for $545.35, dated November 8, 1860, also at fifteen days after sight. These two drafts were payable to the Bank of Galena. Parks settled them with the cashier of the Bank of Peru and took them up. Wheat was shipped by appellant, which Parks received to the value of the five drafts sued on. The business was transacted in this manner: The cashier of the Bank of Peru, gave Parks an order on the agent of the Illinois Central Railroad, at La Salle, to receive all the wheat consigned to the bank, on payment of freight, and he so received of wheat shipped by appellant, seventy-three thousand bushels. This grain, so received, was shipped by appellant with his drafts on the Bank of Peru, in favor of the Bank of Galena, attached to the bills of lading. The price of wheat then ranged from 60 to 92 cents per bushel. Parks paid these

drafts, being forty-six in number, to the Bank of Peru, and took them up. He also paid, on account of the three drafts, over and above the forty-six he fully paid, five hundred dollars, which was remitted to him by appellant by a draft on Chicago, which was paid the appellee.

All the drafts were charged to Parks by the Bank of Peru, and he took them up on settlement with the bank, in this way: Parks manufactured the wheat into flour, and on his shipments of flour drew drafts in favor of the Bank of Peru, on account. The usual custom with him was to send his clerk to the bank, every morning, and obtain currency for his daily disbursements for grain; this clerk was authorized to sign checks on the Bank of Peru, for currency, to take up any acceptances of Parks, or drafts drawn on him as well for the amount of appellant's drafts, as for other shippers of wheat from Galena and from Iowa City, which might be in possession of the bank at the time. With the order he had from the cashier of the Bank of Peru, on the agent of the Illinois Central Railroad, he was enabled to receive the wheat shipped, consigned to that bank, on his paying the freight.

The two drafts, which Parks stated he had paid as above, were produced, and corresponded with the two described in the declaration. Each one was drawn by appellant, on the Bank of Peru, in favor of the Bank of Galena, and indorsed by Hunt the cashier of the Bank of Galena, with the words, "remit as advised." They were marked on their face "paid." The wheat shipped to the Bank of Peru, in the month of November, was on account of Parks, and the receipts given to appellant. There were five shipments made in that month, closing on the 17th of November, amounting to about 40,000 bushels.

On the trial, Ripley, a witness for appellee, who was a clerk in the Bank of Galena, stated that he went with Mr. Corwith to the Bank of Peru, who demanded the drafts of the president, but did not get them. He also made a demand on the cashier, but without success. When he made the demand, he did not state the number of the drafts, but only their gross

amount. Appellee then presented two affidavits of N. Corwith, to the court, to prove the loss of the drafts sued on. None of them were produced on the trial. A witness for the appellee, Walter Ford, proved the several drafts, as described in the declaration, and testified that appellant came down to the Bank of Galena in the early part of June, 1860, to get drafts cashed, when Mr. Corwith told him he would take them on his responsibility, appellant drew as many as fifty of these drafts, and agreed to guaranty them. Corwith sent the drafts to the Bank of Peru, they were all paid except the five in suit. A railroad receipt of wheat was attached to each one of the drafts. In October, Corwith told appellant he would not take any more drafts unless he, appellant, guarantied them. Had before this taken appellant's drafts on Chicago. In April, 1861, a draft drawn by Parks on Chicago was passed to the credit of appellant and duly paid.

Hunt, the cashier of appellee, testified that he attended to the correspondence of the bank, and forwarded all drafts for collection. The five drafts sued on were forwarded by him to the Bank of Peru, with the request that the amount should be remitted to appellee. Haskell was the cashier of the Bank of Peru at that time, with whom he had a large amount of correspondence, commencing in June. The last five drafts were not paid; was advised by letter that the last two were not accepted. The drafts were generally acknowledged by the Bank of Peru, and that was regarded by appellee as an acceptance. A draft of five hundred dollars, drawn by Parks on Chicago, was handed in by appellant, the money collected and applied on a balance due on other drafts, leaving two hundred and ninety-two $\frac{14}{100}$ dollars to be applied on these five drafts. The following is the letter referred to by Hunt, as advising appellee that the two last drafts were not accepted:

"BANK OF PERU, *Peru, Ill., Nov.* 28, 1860.

"C. C. P. HUNT, Esq., Galena:

"Dear Sir: Your favor of the 17th inst. is received, with inclosures as stated. These drafts are held without acceptance,

and should not have been made. I send to-day $2,042.73 for balance acct. as advised. I suppose by now the drafts on Corwith are provided for.      Yours truly,

"N. R. HASKELL."

This balance, Hunt states, was for former drafts which had then matured, and had nothing to do with the drafts in suit, and was applied on such former drafts, making that specific sum. Those drawn by appellant on the Bank of Peru were sent with instructions to remit, and they were coming and going all the time. Appellee charged, on their books, the Bank of Peru with the drafts when drawn and sent to them. When the drafts were paid, appellee credited the Bank of Peru with the amount. Drafts on New Orleans were sent by the Bank of Peru to N. Corwith & Co., but none to appellee. The Bank of Peru sent appellee currency by express, drafts on Chicago and on N. Corwith & Co. Money was sent all the while to appellee; appellee had an account with the Bank of Peru.

Charles Wieth testified that he was in the employment of N. Corwith & Co., in 1860 and '61; on the 2d day of May, 1861, he heard a conversation between appellant and N. Corwith, in which Corwith wanted appellant to appoint an early day on which to pay the drafts, when appellant said he would pay them in four months; Mr. Corwith slipped a piece of paper on his desk, with the word "listen" written on it; they had just come into the bank; the number of the drafts was not mentioned.

It was also proved by Walter Ford, that appellant had deposited in American gold, seventeen hundred dollars with appellee, on the third of May, 1861, which was to be drawn out in gold. When currency was deposited, the depositors could only draw for currency. Appellant drew out on his check four hundred dollars in gold. The difference in value then between currency and American gold was forty per cent. American gold was at forty per cent premium. The balance due appellant on his deposit account is five hundred and fifty three $\frac{87}{100}$ dollars. Appellant drew out currency on all his checks, and the gold was appropriated by appellee, to pay their currency checks. The witness said appellant was entitled to draw out

the full amount ($1,700) in gold, but having drawn only $400 in gold, and having drawn checks for currency, he appropriated the gold to pay them. At the time of the deposit by appellant, gold was worth twelve per cent. over " currency " notes.

Hunt further stated, he had examined the bank books and could find no drafts amounting to the $2,042.73 balance mentioned in Haskell's letter of Nov. 24, 1860, and said that amount was " irrespective of any particular drafts." ·

A verdict having been rendered against the appellant, and a new trial refused, he has appealed to this court, and insists that the court erred in overruling the motion for a new trial, in admitting improper evidence, and in rejecting proper evidence, in giving improper instructions, in refusing to give proper instructions, and because the jury disregarded the law and the evidence in the case.

Mr. L. SHISSLER, Mr. M. Y. JOHNSON and Mr. E. S. LELAND submitted for appellant, the following argument:

The declaration in this case alleges that the defendant agreed to guaranty the payment of certain drafts drawn by him on the Bank of Peru in favor of the plaintiff, and that five of such drafts have not been paid. To the counts of the declaration setting up the guaranty, the defendant pleaded the statute of frauds; that the supposed guaranty, if any was made, was the promise to pay the debt of another person, and that said drafts were the debt of the Bank of Peru, and any promise to guaranty their payment should have been in writing.

I. 1. The evidence showed that the drafts were drawn under a letter of credit, signed by the Bank of Peru. The law is well established, that the party making the letter of credit, becomes an acceptor of the drafts drawn under it. 2 Story 213; 4 Mich. 450; 2 McLean, 462; 3 Comst. 203; 2 Carter, Ind. 488.

In the case of 4 Mich. 450, the letter of credit sued on was in these words: " To enable you to make advances on grain or other produce, to be consigned to us at Oswego during the coming fall, you are at liberty to make drafts on us in amounts

necessary for such operations, on such terms as you can make advantageous for us. Your drafts may be made payable here, or in New York city, at Corn Exchange Bank." Drafts were made payable ten days after sight, and the court held that the letter of credit was an unconditional authority to make the drafts, and amounted to an acceptance of the drafts made.

To the same effect is the doctrine laid down in 3 .Comst. 203. The court say: "A general letter of credit authorizes any person to whom it is presented, to make advances upon it, and as soon as such advances are made, a legal contract exists between the drawer of the letter and the party furnishing funds on its credit, in the same manner as if it had been addressed to the latter by name."

2. If the draft drawn under the letter of credit is an accepted draft, then the acceptor is the party primarily liable on the bill; and in this case, the Bank of Peru is the principal debtor.

In Byles on Bills, marginal page 153, it is stated: "The acceptor is now considered, in all cases, as the party primarily liable on the bill. He is to be treated as the principal debtor to the holder, and the other parties as sureties, liable on his default. The acceptor of a bill stands, for most purposes, in the same situation as the maker of a note."

"The acceptor of a bill of exchange incurs the same liability as the maker of a promissory note." *Cronise* v. *Kellogg*, 20 Ill. 13.

Thus the law changes the position of the parties, when a bill of exchange is accepted. The acceptor is the party looked to for payment. It becomes his debt. He is the principal debtor. So complete is his liability, that it is only in case of refusal of payment on demand upon him, and proof of notice of dishonor given to the drawer within a reasonable time, that recourse can be had to the drawer. Hence any promise on the part of the drawer to guaranty the draft, would be a collateral promise, and should have been in writing.

There cannot be two original promises, unless in cases of joint liability. If Kupfer and the Bank of Peru had jointly

accepted these drafts, then they would have been original promisers. In all other cases, one promise is original, the other collateral. The original promise is absolute. The collateral promise is conditional and qualified. The statute comes in with an iron finger, and decrees that all collateral promises must be in writing.

3. The declaration does not assert that Kupfer agreed to pay the drafts directly, but alleges only in case the Bank of Peru did not pay them. If it was his liability, original and primary, he would have made an absolute promise without referring to the Bank of Peru. The promise alleged to have been made by him was, that he would "guaranty," "save harmless," &c., and is a collateral and qualified promise, showing as clear as language can express, that if anything, it was a guaranty of the debt of the Bank of Peru, which falls within the statute of frauds, and should have been in writing; 2 Saund., Pl. and Ev. 130 c. c.; 17 Ill. 507; *Blank* v. *Duher*, 25 id. 33.

4. The court erred in allowing the testimony of Walter Ford, to be given to the jury, being an attempt to prove a verbal guaranty. The testimony having been objected to by the defendant's counsel, and allowed by the court, it served to prejudice the minds of the jurors, and to destroy the moral force of the defense, aside from the objection of its being illegal.

5. The jury disregarded the law and the evidence in finding the issues of "no guaranty in writing," in favor of the plaintff.

II. The Bank of Galena cannot recover on the bills of exchange against the defendant. Its sole remedy is against the Bank of Peru.

1. This case is not like an ordinary suit on a bill of exchange. Here the defendant had no funds with the Bank of Peru, and it was not contemplated by the parties that he should have any. The defendant had been asked to sell grain. He refused to do so, unless the cash was paid to him. He required that arrangements should be made, by which he could obtain cash for the grain. The Bank of Peru made the arrangement, and the Bank of Galena paid the money, knowing the Bank of Peru was responsible; and that the wheat

itself was ample security. Kupfer having refused to become liable, when Corwith paid the money, it was on the responsibility of the Bank of Peru alone.

See letter of June 6, 1860, introduced in evidence by the Bank of Galena:

" To R. G. PARKS — As it is now against my principles to sell grain on time, I would like you to make such arrangements *here* as to get the cash for the wheat on delivery. Expecting an answer immediately, I am, &c., H. KUPFER."

This letter proves that Kupfer refused to sell grain on time, demanded the money, and that arrangements must be made *here*, by which he could get the cash. He had grain to sell. He wanted the money, and would take no responsibility in the matter. Corwith knew this, and was a party with the Bank of Peru to pay the money. The Bank of Galena could well consent and undertake to pay the cash, when it had the written evidence of responsibility from the Bank of Peru — not of a single individual, but of a number of persons with an aggregate of capital, and also the grain itself, which was worth the money paid. Any other construction would permit these two banks to act in collusion, and after getting the large amount of wheat from Kupfer, swindle and defraud him out of the money. In connection with this, take the evidence of Parks, who testifies that he came to Galena with this letter of credit, was in the Bank of Galena, showed it to Mr. Corwith the president, and there is the proof of the arrangement which Kupfer required to be made *here*, by which he could obtain cash for his wheat. Then notice the fact that the letter of Kupfer is dated the 6th of June, 1860, and the letter of credit is dated on the 7th of June, 1860, allowing the usual time for the transmission of the letter of Kupfer to Parks, and we have the entire transaction established beyond the chance of doubt or discussion.

That Parks was in Galena, is shown by his own testimony, and by John T. Cook and J. R. Booth.

2. The mode of transacting business by the Bank of Galena with the Bank of Peru proves that it was solely a mat-

22 — 34TH ILL.

ter of arrangement between the two banks. "These drafts were coming and going all the time. We charged the Bank of Peru on our bank books, with the drafts when drawn and sent to them. When the drafts were paid we credited them with the amount. The Bank of Peru sent us currency by express, drafts on Chicago and drafts on N. Corwith & Co. Money sent all the while to Bank of Galena. We had an account with the Bank of Peru."

The letter of Haskell, the cashier of the Bank of Peru, stated : "I send to-day $2,042.73, for *balance* acct. as advised."

This letter was introduced in evidence by the plaintiff to show that the last two drafts were not accepted. But the other three drafts sued on and sent previously, must have been accepted.

This letter proves the manner in which the two banks carried on business, having a running account, charging each other with drafts, and sending balance of accounts.

Hunt testified : "The amount of $2,042.73 was for drafts to that amount, drafts making that specific sum."

Hunt contradicts this : "I have examined the bank books, and can't find any drafts amounting to the $2,042.73 balance mentioned in Haskell's letter of Nov. 21, 1860. That amount is irrespective of any particular drafts."

Why did the Bank of Galena charge the Bank of Peru with the drafts? Does that not show an exercise of ownership, a claim solely of the Bank of Galena against the Bank of Peru? When a merchant sells goods he charges them ; when the purchaser pays, he credits the amount paid. "We had an account with the Bank of Peru." When they charged the Bank of Peru on that account, the Bank of Galena had to sue the Bank of Peru on the account. The drafts were merged in the account. They did not send the draft and then notify Kupfer of its non-payment. They received money by express, received other drafts in payment, trading in drafts on Chicago and N. Corwith & Co., all done under this arrangement, and with the consciousness that Kupfer was not responsible in any form. Wheat was sold to the amount of $36,170, the money paid to

Kupfer under this arrangement between the Bank of Galena and Bank of Peru. Forty-nine drafts were drawn, commencing on the 27th day of June, 1860. Forty-six drafts were paid, having been charged to the Bank of Peru by the Bank of Galena, the only party that could charge them; and because the Bank of Peru fails to make good its arrangement with the Bank of Galena, an attempt is made to swindle Kupfer out of the wheat, and make him pay the money.

III. The shipping of grain and attaching railroad receipts shows that the drafts were produce bills for which Kupfer was not responsible.

1. Kupfer was not drawing for money; he was being paid for his grain. If he was drawing for money, he would do so irrespective of the grain. But here, he places the grain in cars, goes and gets his money for the grain, and under the arrangement between the Bank of Peru and Bank of Galena, makes a draft, and, attaching the railroad receipt, gives it to the Bank of Galena. These railroad receipts vested in the Bank of Galena the control over and the title to the grain. It could give the grain away or sell it, and Kupfer could not complain. It could stop the grain *in transitu*, or refuse to deliver it until its claims were paid by the Bank of Peru. Thus the Bank of Galena had the means of payment under its control.

IV. We maintain that the possession of the railroad receipts for the grain, was evidence of title, and Corwith could retain possession until the drafts were paid.

We have been unable to find any case directly in point, but reasoning from analogy, we think it is sound in principle. It is well established, that a bill of lading carries title to property. A vessel at sea can be sold by its title papers, the cargo by the bills of lading. Also a warehouseman's receipt is evidence of title to property stored. 4 Iowa, 52. The only difference between a warehouseman's receipt and a railroad receipt, is, that one describes property in store to remain at a particular place, while the other describes property in a car, to be carried to a particular point. Why should not the railroad receipt be evidence of title to personal property? The fact that the pro-

perty is in motion, cannot alter the principle. The Bank of Galena had the control and possession of the grain, the title was vested in them, they could stop the grain, or sell it, and it was their duty to have been paid before permitting it to leave their control. They neglected to do so, and the defendant Kupfer is absolved from all liability. Therefore the refusal by the court to give the defendant's 5th instruction was erroneous.

But when suit is brought, we have a right to compel the Bank of Galena to account for the grain. Suppose the Bank of Galena sold the grain, could it sue the defendant? If the Bank of Galena gave the grain away, it could not sue us. That would be its own loss. It is responsible for the value of the grain.

In 31 Penn. 110, the court says "That in an action on a guaranty, it is a good defense, that collateral securities assigned by the principal at the time of making the contract of guaranty for the security of the same debt, have been lost through the want of plaintiff's diligence."

This principle we regard as applicable to this case. The Bank of Gelana should be required to account for the grain, even if the court should hold that the grain was simply collateral security. The defendant cannot sue R. G. Parks, for he is responsible to the Bank of Peru. The Bank of Péru is responsible to the Bank of Galena, and the action should have been brought against it.

Common justice would require the Bank of Galena to place Kupfer in the same position in which he stood when the money was paid to him, and restore those rights and that property he held at that time, if it desired to commence suit against him.

V. The court erred in refusing to give the defendant's fourth instruction in regard to the effect of the payment by R. G. Parks of two of the drafts sued on.

The testimony showed that two of the drafts sued on, one for $1,039, and the other for $545.45, had been taken up from the Bank of Peru and paid by Parks. These drafts were produced by the defendant, Kupfer, on the trial, and were in evidence before the jury. They had ceased to be under the control of

the Bank of Galena. When Parks paid the Bank of Peru the amount of the two drafts, and took them up, the drafts then became *functus officio*, and could not be revived. Neither Kupfer or any other person could be sued upon them.

The Bank of Galena having instructed the Bank of Peru to remit the money as advised, if the Bank of Peru failed to do so, it became simply a question between the Bank of Galena and Bank of Peru, on account of the failure of the latter to remit the money. The drafts were not lost instruments, they were *paid* instruments. Suppose Kupfer had gone to Peru and purchased the grain, paying the Bank of Peru the amount of the drafts, and taking them up, could the Bank of Galena sue Kupfer on the drafts as lost instruments?

The remedy of the Bank of Galena would be against the Bank of Peru for the money or "balance of account."

Suppose the Bank of Peru had sent in payment to the Bank of Galena certain drafts on Chicago or on New Orleans, which had been lost through negligence or delay on the part of the Bank of Galena, and that the Bank of Peru had claimed that the drafts were paid, would not every principle of honesty and justice demand that the Bank of Galena should be compelled to pursue its remedy against the Bank of Peru?

VI. The court erred in refusing to give the instruction in regard to the defendant being entitled to the difference in value between American gold and currency.

It was proven on the trial that the defendant, Kupfer, had made a special deposit of $1,700 in American gold, with the plaintiff, and that he was entitled to draw out the same in gold. That gold was worth 40 per cent. premium, and $550 still remained in the Bank of Galena. The jury should have allowed the defendant the sum of $550, with 40 per cent., making $770. The defendant was also entitled to the difference in value between $1,150 in gold and the same amount in currency. Ford testified that the defendant drew out that amount in currency, when he was entitled to draw it in gold.

Since the deposit was made, Congress has changed the circulating medium of the country, by substituting for gold and sil-

ver, which have a positive intrinsic value, a paper currency that has none. The result has been that gold has ceased to be a circulating medium, but has become an article of merchandise.

When gold is no longer the standard, but paper currency, greenbacks, have become the representative of money, by force of legislation; when men cannot collect their debts in gold and silver, but must take paper; then they will endeavor to obtain it by special contracts, and those contracts must be construed like any other business agreements.

An ounce of gold is regarded by the commercial world as a positive measure of value, as a universal medium of exchange, and a gold dollar has a value as certain as an ounce of gold. An agreement to pay $550 in gold is subject to the same rules of construction as a contract to pay 550 feet of fencing, 550 lbs. of cotton, or 550 lbs. of lead. In case of a failure to pay, the respective values of those articles could be determined by proof. In either case, the promissor would be required to furnish the articles, or their value, in such money as the law allows to be obtained on the collection of judgments.

If a party agree to pay another one hundred eagles, American gold, it would be a special contract, and the value of the gold could be collected in paper currency on judgment and execution.

The United States government has regarded gold as the subject of special contract, in the issuing of what is termed 5-20 bonds, bearing interest payable in gold, and the principal sum to be paid in gold. Suppose the government failed to pay, would not the holder of the bonds be entitled to the equivalent of gold in treasury notes? Treasury notes are simply promissory notes, and bank notes, promissory notes, and all other kinds of paper currency, are worth just what they will bring, and no more. These greenbacks pretend to be promises to pay certain amounts, at a particular place, but they are not redeemed, and are a fraud and deception on their face.

Aside from the foregoing reasons, there is another objection. The law declaring treasury notes to be a legal tender was passed

subsequent to the transaction between these parties, and can have no application, being an *ex post facto* law.

There are some statements of Ford in regard to a conversation between Corwith and Kupfer in regard to the guaranty of these drafts, which is susceptible of explanation. This testimony was objected to, but allowed to go to the jury. The objection was a sound one, that verbal evidence of a guaranty was incompetent; it should have been proved in writing. But this testimony of Ford must have occurred previous to June 6, 1860. He says it was in the early part of June. Corwith introduced in evidence Kupfer's letter of June 6, 1860, showing that Kupfer refused to become responsible, and demanded that some arrangement should be made here, in order that he could obtain cash for the wheat. That arrangement was made, and Kupfer was not regarded as liable in any form.

If Kupfer was responsible, why did Corwith in October send a draft by way of Chicago, and ask Kupfer to guaranty the drafts? If Kupfer, according to the testimony of Ford, had guarantied the drafts, why did Corwith insist upon his doing it then? Whatever talk may have occurred in Ford's presence, or whatever part of it he may have recollected, Corwith's acts and conduct show that the grain had been shipped under the letter of credit and arrangement made with the Bank of Peru, to which Kupfer was only a party in receiving the money for his grain.

Would Corwith require Kupfer to guaranty the responsibility of the Bank of Peru, an association of individuals with a large capital? Would he require Kupfer to guaranty it, after the bank had made arrangements in writing — absolute proof of their liability, and when Corwith had the control and possession of the wheat, which was at all times worth the money paid on it? Such a theory is as improbable as it is absurd in practice.

The court allowed improper evidence to go to the jury, in that of Wyeth, who stated that Corwith and Kupfer came into the bank, and Corwith slipped a piece of paper with "listen" written on it, and then Kupfer promised to pay the

drafts. This was another attempt to prove a verbal promise to pay the debt of the Bank of Peru, and should have been excluded from the jury.

If any of the foregoing views of this case are correct, the judgment of the court was erroneous.

Messrs. GLOVER, COOK and CAMPBELL in reply.

The appellants insist that these drafts were drawn under the letter of credit, signed by the Bank of Peru, and that therefore the Bank of Peru became an acceptor of the drafts as soon as they were drawn, and were the principal debtors to the Bank of Galena, when that bank discounted the drafts, and that the promise of Kupfer, made at the time when he procured the drafts to be discounted, to guaranty their payment, was void under the statute of frauds, not being in writing.

The first reason we assign why this is not so is this: The drafts which the Bank of Peru accepted, or agreed to accept, were drafts to be drawn by R. G. Parks, or his agent. These drafts were drawn by Kupfer, in his own name. This changed the whole question. The Bank of Peru might safely agree to accept the drafts of Parks, or by himself as agent, upon the responsibility of Parks himself, and might be unwilling to accept the drafts of Kupfer, for which Parks was not responsible. To say that this letter of credit bound the Bank of Peru to accept the drafts of Kupfer, not drawn as the agent of Parks, is to make a new contract for the parties, and one which they have not made. A surety must be held according to the unchanged tenor of his contract, or not at all. 31 Barb. 486.

A contract of guaranty must be construed strictly. Pars. M. L. 65.

If this view is correct there was no debt existing from Bank of Peru at the time the guaranty was given, and the draft was taken on the responsibility of Kupfer alone, and the debt was his debt, and the statute of frauds has no application.

But we insist that the statute of frauds has no application even upon the state of facts claimed to exist by appellant. If,

before these drafts were discounted, they had the same effect as a promissory note, of which the Bank of Peru was maker, and Kupfer payee. The case is directly within the case of *Smith* v. *French*, 2 Scam. 325.

The real question in this case in determining whether the guaranty of Kupfer of these drafts was an original or collateral undertaking is, to whom did the Bank of Galena give credit? This question is for the jury to decide, upon consideration of all the points of the case. In this case the jury were authorized to find that the credits were given to Kupfer. It was expressly stated that the appellee took the drafts upon the responsibility of Kupfer. Kupfer advised Parks by letter that this was so. It is also proven by two witnesses who heard the agreement. The Bank of Galena gave no credit to the Bank of Peru; it took the drafts wholly upon the responsibility of Kupfer.

But there is another ground upon which the plaintiff's right of recovery is clear.

After the drafts were sent to the Bank of Peru and not accounted for, Kupfer promised to pay them in four months.

There are counts in the amended declaration upon each of these drafts, averring presentment, non-payment, and notice to Kupfer. There are counts also upon the drafts averring presentment and non-payment, and that Kupfer, knowing all the facts, promised to pay them.

If due notice of non-acceptance or non-payment be not given or a demand on the maker of a promissory note be not made, yet a subsequent promise to pay by the party entitled to notice, be he either drawer or endorser, will amount to a waiver of the demand or notice, provided the promise was made clearly and unequivocally, and even under a mistake of the case, if it was with a knowledge of a want of diligence on the part of the holder. The weight of authority is that this knowledge may be inferred as a fact, from the promise under the attending circumstances, without requiring clear and affirmative proof of the knowledge. 3 Kent's Com. 112–13; *Lundie* v. *Ralentson*, 7 East, 231; *Piersons* v. *Hooker*, 3 Johns. 63; *Hopkins* v. *Les-*

*well*, 12 Mass. 52; *Breed* v. *Hillhouse*, 7 Conn. 513; *Smedes* v. *Marshall*, id. 72.

*Tibbetts* v. *Dowd*, 23 Wend. 379, is a leading case on this subject, in which all the cases are reviewed with great care and ability.

2d.  The promise of payment by Kupfer, was proof of presentment to the Bank of Peru, of the dishonor of the draft and of notice to Kupfer.   *Tibbetts* v. *Dowd*, 23 Wend. 379.   And more than one hundred cases cited in the very able and elaborate opinion in that case.

If I am correct in the foregoing propositions, and they seem to me incontrovertible, then the instructions given for plaintiff below were right.

We call the attention of the court now to the errors assigned in their order:

1st.  The court erred in overruling motion for new trial and in rendering judgment.

The first answer is that the evidence fully supported the verdict.   The letter of credit only authorized drafts to be drawn by R. G. Parks, by himself or his agent.   They were to be so drawn as to make Parks responsible upon them.   These drafts were not so drawn.   There is abundant proof that before the Bank of Galena took the drafts, Kupfer agreed to be responsible for them, and they were taken on his responsibility only. This is proven by Walter Ford.

2d.  It is proven that Kupfer, after the dishonor of the drafts, agreed to pay them.

The 2d answer to this assignment of error is a conclusive one.   The overruling of the motion for a new trial was not excepted to.   The court will look in vain in the bill of exceptions for any such exception.

It is true, that in making up the record, the clerk writes such an exception, but this does not make it a part of the record.   *Dickhut* v. *Durrell*, 11 Ill. 72; *Magher* v. *Howe*, 12 id. 379; *Moss* v. *Flint*, 13 id. 572.

3d.  Error, admitting improper evidence.

The only exception taken by appellant in the court below,

was taken, not to any evidence offered to the jury, but to two affidavits of Corwith offered *to the court*, to show that the drafts were not in the power of the bank to produce.

This evidence was offered to the court, and no exception will be made to the decision of the court in receiving it. If the affidavits were not sufficient, the way to save the question was to have objected to the admission of secondary evidence of the contents of the drafts, and if admitted, to have excepted. This was not done.

But the affidavits were sufficient. Corwith swears that he was the managing agent of the Bank of Galena, that the drafts were sent to the Bank of Peru. That he applied to the Bank of Peru for them; that he was told they were not there; that he was informed that the former cashier of the Bank of Peru had absconded to Canada, and taken the drafts with him or destroyed them; that thorough search was made by the officers of the Bank of Peru for the drafts, among the papers and files of said bank, but that they could not be found.

This was sufficient search. A thorough search among the papers and files of the bank, means a careful search among all its papers and files, so decided in *Doyle* v. *Wiley*, 15 Ill. 579. The plaintiff could do nothing more to find the drafts. The absconding cashier in Canada alone knows what had become of them. *Bestor* v. *Powell*, 2 Gilm. 125.

It is claimed by appellant that an exception was taken to the testimony of Walter Ford. We do not think there was. The words of the record are "defendant objected and excepted to all this testimony." He did not except to any ruling of the court, so far as the record shows. .

But what was the testimony? It was that when Kupfer presented the drafts to the Bank of Galena, he guarantied them. If we are correct in our view of this letter of credit, there can be no question as to the competency of this testimony. The Bank of Peru had not accepted or agreed to accept Kupfer's drafts; it had only agreed to accept drafts of R. G. Parks, drawn by himself or agent, they must be the drafts of Parks, whether drawn by himself or his agent. Kupfer

presented drafts not accepted, and agreed to guaranty the payment. This he could do by parol.

But this testimony was competent for another purpose. It is in proof that after these drafts were dishonored, Kupfer agreed to pay them. The testimony objected to was competent for the purpose of showing a consideration for that promise, and also as corroborating the proof of the subsequent promise and showing its probability.

But if the promise was made by Kupfer to pay the drafts after they were dishonored, this testimony of the original guaranty could not have injured the defendant in any way; leaving this testimony out, plaintiff must recover, and the true question was left to the jury by the first instruction.

The 4th assignment of error is:

In rejecting proper evidence. No exception was taken by defendant below to any evidence offered and rejected.

5th error assigned. In giving improper instructions. This question has been discussed in our first point.

6th. In refusing to give proper instructions.

The first instruction refused, says in substance that plaintiff must prove a written guaranty of the drafts before he could recover.

This is certainly not law. If Kupfer drew the drafts and they were dishonored, he is liable for them, if due notice was proven, or if any promise was proven which dispensed with proof of notice. There was proof tending to show such a promise, and the court had no right to say it was not proven.

The 5th instruction, the 2d refused, is not law. It is in substance that if the Bank of Galena received the drafts in question, with the receipts of the Illinois Central Railroad attached to them and forwarded the receipts to the Bank of Peru, and surrendered the receipts without receiving payment for the drafts, then plaintiff cannot recover on the drafts without accounting for the value of the wheat.

This instruction supposes that the mere fact that the railroad receipts were attached to the drafts, made the Bank of Galena responsible for the wheat, no matter what might be the agree-

ment of the parties in relation to it. If the parties had agreed that the wheat should be delivered to the Bank of Peru, before the payment of the drafts, that agreement was binding, and it was for the jury to say what the fact was. The Bank of Peru had agreed to be responsible for any drafts, only in the event that the railroad receipts were forwarded to them, and the drafts had fifteen days to run, and they were discounted, not on the responsibility of the Bank of Peru, nor on account of the wheat, but on the responsibility of Kupfer.

The agreement of the parties must determine the liability of the Bank of Galena for the wheat, and the jury were to say what that agreement was.

The 6th instruction asked, 3d refused, is not law.

Parks was not a party to the drafts; they were drawn on the Bank of Peru by Kupfer; if Parks paid the amount of them to the Bank of Peru, that did not take up the drafts or change the liability of the Bank of Peru upon them in any way.

The 7th instruction asked, 4th refused, is not law.

If the Bank of Galena was indebted to Kupfer for money deposited, it had the right to pay that indebtedness in legal tender notes, or to treat the same as money and apply it upon Kupfer's indebtedness. Kupfer had acknowledged this claim, and agreed to pay the drafts, and had paid $550 in gold coin, would he, from these facts alone, be entitled to a credit of over $550? Certainly not, and that is decisive of this question.

Judge LELAND says that the jury, in willful disregard of the law and the evidence, found the issues of "no guaranty in writing," in favor of the plaintiff.

There was no such issue. The replication was that the promises were not special promises to pay the debt of another person, to wit, the Bank of Peru. If the issue was found by the jury, against the law and the evidence, why did not the appellant except to the overruling of the motion for a new trial, and so present the question to this court, and as he has not, why does his counsel talk about a question not before this court?

Counsel carefully quoted just half of the letter of Kupfer, dated June 6th, 1860, why not the whole?

The manner of keeping accounts between the banks, proves nothing. It was, of course, necessary to keep such an account in order to see what drafts were paid by that bank; Kupfer, as drawer of the drafts, or as guarantor, was liable, only in the event the bank did not pay them, but that does not show or tend to show that *when* Kupfer guarantied the drafts, that any debt was owing from Bank of Peru, or that he would not be liable for the drafts, as drawer, after non-payment by Bank of Peru, and notice to him, or waiver of notice. We cannot reply to the argument in detail, but we think it is conclusively answered in the points made by us.

Mr. Justice Breese delivered the opinion of the Court:

Appellant makes these points: First. The drafts having been drawn under this letter of credit, signed by the Bank of Peru, are regarded as accepted drafts, and being accepted drafts, they became the debt of the Bank of Peru, the acceptor being primarily liable. He is regarded in the same light as the maker of a promissory note. It is his debt. He is the party looked to for payment, and being the original debtor and primarily liable, a promise by any other person to pay them is a collateral promise, and must be proved to have been made in writing.

In support of this proposition, the following authorities are cited: 2 Sto. 213; 4 Mich. 450; 2 McLean, 452; 3 Comst. 203; 2 Carter (Ind.), 408.

This proposition assumes that the drafts were drawn under the authority of the letter of the Bank of Peru, of the date of June 7, 1860. That authority is to R. G. Parks, or his agent, to draw. The jury have ignored the fact that appellant was the agent of Parks to draw these drafts, for that question was distinctly put to them by the appellee's third instruction. It was this: " In order to entitle the letter of credit referred to in this case to any consideration as evidence, the jury must be satisfied from the proof that the drafts sued on were drawn by the defendant Kupfer, agent of R. G. Parks; and if the jury believe from the evidence that the drafts were drawn by Kup-

fer on his own responsibility, and that he was not the agent of R. G. Parks, then said letter of credit should be disregarded by the jury."

The fact is found by the jury that these drafts were not drawn by appellant, as the agent of Parks, on the letter of credit given by the Bank of Peru, consequently they were not accepted drafts by that bank. The Bank of Peru at no time agreed to accept appellant's drafts. It follows, then, that those drafts were like other commercial paper, which, if not paid by the drawee, the drawer must pay. No question of original or collateral undertaking can arise in any such case — no question of guaranty, and no question as to the nature of the guaranty, whether it must be in writing or may be by parol. The testimony, to the point that Corwith would take the drafts only on the responsibility of appellant, and his alleged promise to guaranty them, amount to nothing; for by the very act of drawing he guarantied their payment, and could be called on for payment on certain conditions; that having funds in the hands of the drawee, the drafts were presented to the drawee and payment refused, and he duly notified of the refusal. His liability is then complete. But if he had no funds in the hands of the drawee, nor the expectation of any, he would not be entitled to notice of the refusal of the drawee. And the reason is, having no funds, notice could do him no good; there was nothing in jeopardy which he might save by timely notice.

But the appellant had every reason to expect there were funds in the hands of his drawee to meet these drafts when he drew them, as the railroad receipts for the wheat were transmitted at the same time, of value sufficient to pay them all. He was then entitled to notice of the refusal of the Bank of Peru to pay these drafts, and that is all he could claim. He occupied the position of any ordinary drawer of a bill, and nothing better. Did he have this notice, and what did he do when the fact was brought to his knowledge that the drafts were not paid? That he had notice is not denied, and that he promised to pay them in four months thereafter is proved. It is true, no formal notice was given appellant; but it is fairly

inferable, from the conversation with Corwith in the Bank of Galena, that appellant well knew all the facts in relation to the non-payment of the drafts by the Bank of Peru, and with this knowledge he made the promise to pay them in four months. *Tibbetts* v. *Dowd*, 23 Wend. 379, and cases there cited.

It would seem, however, from the manner in which this trial was conducted, in the various efforts to prove a guaranty of these drafts by appellant, that appellee really considered the Bank of Peru the party liable, and that it was necessary to their success they should prove a guaranty. And, in truth, there was ground for such an idea, furnished by the repeated drafts drawn after the date of the letter of credit, and their payment by Parks, who was enabled to control the wheat sent forward to meet them. But their true position was that of holder of unpaid drafts, on which the drawer was responsible after their dishonor by the drawee, and notice thereof to the drawer.

The next point made by appellant is, that appellee cannot recover on the special counts on the bills of exchange, against appellant, their sole remedy being against the bank of Peru. The bills of exchange here spoken of, are the drafts in suit, which are all counted on in the declaration, with proper averments of presentment and non-payment and notice to appellant, and a promise by him, with a knowledge of all the facts to pay them.

If the views we have presented in discussing the first point be correct, and of this we do not doubt, this point is disposed of also.

The drafts not being accepted drafts by the bank of Peru, or if accepted, not paid by that bank, the remedy over, by appellee against the drawer, cannot be disputed. The transaction with appellee does not appear to us to be of the character given to it by the appellant. He seems to think that by drawing these drafts and getting the money on them from the appellee, he was but selling his grain, whereas, it seems to us, that this was the mode appellant resorted to, by which to raise money to

purchase grain. The advances were all made by appellee on appellant's responsibility, and to inspire confidence in the drawee, the bank of Peru, that the drafts had a sufficient basis to rest on, the receipts of the railroad were attached to, and sent on with the draft, thereby assuring the bank of Peru that value would be under their control sufficient to satisfy them. Such transactions are quite common, and sometimes greatly aid the enterprise of business men, and increase trade. In no light in which we can look at the transaction, can the appellee be considered as the purchaser of this grain. They advanced the money to purchase it, taking for their protection, the drafts on the bank of Peru, with railroad receipts to their value, attached to them, and the drafts being all payable fifteen days after sight, the bank of Peru, the consignee, was enabled in that time to get the funds to meet them, which they did do, in all but three cases, as Parks, for whose benefit the arrangement was made, took up the drafts as fast as presented with the exception stated. How the transaction can be regarded as a sale by appellant of the grain to appellee, we cannot understand. When appellant wrote to Parks that it was against his principles to sell grain on time, and he Parks must make such arrangements at Galena as to get the cash for the wheat on delivery, had no reference to a sale of wheat at Galena; that is the place where it was bought, but it was to be delivered at La Salle, and an arrangement must be made at Galena, by which, when the wheat was delivered at La Salle, it would be paid for, and this arrangement was the letter of credit from the bank of Peru, and which answered the purpose from June to November. Appellee was not buying grain, but furnishing funds to appellant with which he could buy it.

It is very apparent, these banks kept running accounts with each other, and the appellees were creditors of the Bank of Peru for all the moneys received by that bank on account of their drafts, and the Bank of Peru was the debtor to appellee for the same. This is undeniable. The balances in favor of appellee were met by money by express, by exchange on Chicago and elsewhere, and money was passing between them all

23 — 34TH ILL

Kupfer *v.* The Bank of Galena.

the while. So says cashier Hunt. All these drafts were charged by appellee against the Bank of Peru, and the account credited by remittances. The drafts were sent with instructions to remit. When, therefore, the two drafts described in appellee's third and fourth counts, and which were produced on the trial, marked on their face "paid," and which Parks testified he had paid, when they were so paid to the Bank of Peru, that bank became the debtor of appellee for their amount; for it is apparent the Bank of Peru had this credit with the appellee all along, as the business progressed, until the 17th November, 1860. For this amount, appellee is clearly entitled to a credit, for these his drafts were paid to the party and in the mode and manner expected and understood by appellee; and if the Bank of Peru proved dishonest and unfaithful, the appellant is not implicated. His promise to pay the drafts only embraced such drafts as had not been paid; for it would be unreasonable to suppose he would, without a consideration, undertake and promise to pay drafts which had been paid in the mode and manner agreed upon. If appellee has not been so fortunate as to receive the proceeds, the loss must be his, and the judgment, to the extent of these two drafts, is erroneous, and must be reversed.

Another point made by appellant is, that the court erred in refusing to give appellant's fifth instruction, to the effect that the plaintiff below, before he could recover in this suit, if at all, must account for the value of the wheat.

From what we have already said, this instruction was properly refused, for appellee had nothing to do with buying or selling wheat. The receipts of the railroad were mere vouchers of the quantity of wheat shipped, which no party supposed the Bank of Galena was to go into the market with and sell. Appellee had nothing to do with the wheat, nor was it at any time agreed that the Bank of Galena should have anything to do with it. It was purchased for Parks, and he controlled the receipts after they were transmitted to the Bank of Peru. It is not true that appellee had control of this wheat, or any power to sell it. They did not receive the railroad receipts for any purpose of control, but for the purpose stated. Appellant

never passed the wheat to appellee for so much money, nor for any purpose, as the case plainly shows, consequently there is no obligation on appellee to account for the wheat, and the instruction was properly refused.

The other point made by appellant as the fourth, to the effect that Parks having taken up and paid two of the drafts sued on, no action could be maintained against the defendant, has been disposed of by allowing the same. The instruction should have been given so far as to tell the jury if any of these drafts had been paid to the Bank of Peru, then that bank became the debtors to the Bank of Galena for their amount, and Kupfer was not liable on them.

About the time these drafts should have been paid, the Bank of Peru sent a remittance to appellee, under date of November 21, 1860, of two thousand and forty-two $\frac{73}{100}$ dollars "for balance of account as advised." Now, as no officer of the Bank of Galena, or other person, has stated what balance this was, and when the cashier, who ought to know, fails to tell on what account this remittance was sent, but contents himself with saying it "was irrespective of any particular drafts," the inference is not a forced one that it was on account of these drafts. But be that as it may, the appellant is entitled to a credit for them.

The fifth point made by appellant is the refusal to give the instruction in regard to the right of appellant to have the difference allowed him between American gold and paper money.

This right, it seems to us, is very evident, very reasonable, and unquestionable. This deposit of gold coin was a special contract, to the effect that appellee would return the coin, or, on failing to do so, appellant should be entitled to the value of the coin. The appellant was entitled, if he was paid in currency at a discount, to have the amount of that discount allowed to him, or, in other words, he was entitled to receive of the bank the premium at which gold was sold over currency, and this for the whole amount deposited, unless he agreed to receive currency as coin. The bank had no right to make appellant's check for currency a charge against this deposit of gold. What

the gold was worth over and above currency, at the time appellant drew it out, should be allowed. The several acts of Congress making treasury notes a legal tender in the payment of private debts were not then enacted; consequently, appellant was entitled to recover the value of the gold coin.

These are the principal points made by the appellant. Another, of minor consideration, is, the admission of parol proof of the contents of these drafts. We think the affidavits of Corwith were sufficient to let in such proof.

For the reasons given, the judgment of the court below is reversed, and the cause remanded for other proceedings not inconsistent with this opinion.

*Judgment reversed.*